OPINION. Harron, Judge: These proceedings involve those who were at one time the three sole stockholders of Paramount. The Commissioner audited Louis’s return for 1950 first. When he later audited the returns of Monroe and Bernard for 1950 he made a determination which was inconsistent with the one he had made in determining Louis’s income tax liability. When these cases were ready for trial, they were consolidated because the issues arise out of one transaction, that of May 29, 1950. In the case of Louis, the question is whether the transaction resulted in capital gain or ordinary income. In the cases of Monroe and Bernard the issue is whether they received constructive dividends from Paramount. Counsel for each party takes a position which differs from his opponent, and since the respondent has taken an inconsistent position, he has had to file a different brief in the cases of the sons than in the father’s case. Altogether, four sets of briefs have been filed. There would be unnecessary repetition if an attempt were made to deal with the various questions as would be done if these cases had not been consolidated. Upon careful consideration of all of the arguments and contentions of each counsel, it appears that the issues can be considered best if the cases of Monroe and Bernard are discussed first. For convenience and in the interest of clarity, this is done, but such order of consideration is not prejudicial to any party; the conclusions reached would be the same if some other method of stating them were employed. It is the Commissioner’s contention that the payment of $98,782.50 by Paramount to Louis was made in behalf of Monroe and Bernard, and that, in effect, Louis sold his 48 shares of Paramount stock in equal amounts to his sons on May 29, 1950, and that, since funds of Paramount were used by the sons to purchase the stock, the payment by the corporation constituted dividends to them under section 115, 1989 Code. The sons contend that prior to May 29, 1950, they became the owners of 46 shares of Paramount stock by virtue of alleged gifts of the stock to them on May 24, 1947, when 2 certificates, for 23 shares each, were issued in their respective names, and that on May 29, 1950, Paramount purchased only 2 shares of stock from Louis, which, they say, constituted a redemption of the 2 shares, and, also, paid Louis for various covenants, such as a noninterference covenant, all of which did not result in taxable dividends to them. Upon consideration of all of the record, we have found as fact and conclude that Louis did not make completed, bona fide gifts of 23 shares of stock to each of his sons in May 1947; that his sons were merely nominees whose names were used to suit the convenience of Louis for reasons best known to himself; and that Louis was the owner of the 46 shares after May 24, 1947, until immediately prior to his execution of the agreement with Paramount on May 29, 1950. There was no document of transfer of the stock, and there was no actual delivery thereof to the sons. They endorsed the certificates in blank, and Louis’s attorney, Elder, kept them, so that Louis, through his attorney, retained the power to use and control the stock; it was not put beyond his reach and control. The evidence does not establish that Louis intended to make completed gifts in praesenti to his sons of the stock on May 24, 1947. Rather, the entire record estab-lislies that Louis intended to retain complete ownership and control over the 46 shares of stock, that he told his sons that he was to remain in control of Paramount, and that the 46 shares of stock would go to them upon his death. He did not part permanently with all interest in the 46 shares at that time. On the matter of the understanding among the parties on May 24, 1947, there is conflict between the testimony of Louis and that of each of his sons, who testified that they understood that Louis had made a gift of the stock to them. But the testimony of Monroe and Bernard is limited to their self-serving conclusion, and there is no independent proof that each, at any time, exercised dominion and control over the shares of stock placed in their names. They did not attempt to give any explanation of why they endorsed the certificates in blank, gave them to Elder, and allowed them to remain in his possession, if they regarded the 46 shares of stock as belonging to them. There is no evidence of any action on the part of either Monroe or Bernard to establish their acceptance of all of the incidents of ownership of the stock. On the other hand, Bernard testified that after Freda’s death, her daughter, whom Louis had not adopted, instituted litigation against Louis, which serves to corroborate Louis’s statement of his motive for putting the 46 shares in the names of his sons, so that neither the stock nor the business of Paramount would be jeopardized if any marital difficulties arose, or claims were made after his death. The filing of the gift tax return reporting gifts of the stock is not conclusive of the question. That was done on Elder’s advice, and was consistent with the general plan of putting the stock beyond the reach of anyone making a claim against Louis. There is testimony that during a conference with attorneys of Louis, Monroe stated that his father was the real owner of the 46 shares of stock after May 1947. Such testimony conflicts with his present contention. There is, also, testimony of Goldsmith that at the closing on May 29, 1950, Elder stated to the other attorneys who were present that the 46 shares of stock belonged to Monroe and Bernard. Elder did not testify in these proceedings, however, and the absence of his direct testimony and of cross-examination of Elder militates against giving much weight, if any, to the testimony of Goldsmith on this point. Elder’s statement to Goldsmith at the closing, as quoted by Goldsmith, constitutes a conclusion about a question which is now before us for decision, and our decision must be based upon all of the record before us. The quoted statement of Elder can be understood as a statement of his position, consistent with his earlier advice to Louis to transfer the 46 shares into his sons’ names, and with his drafting of the agreement of May 29, 1950, to refer to only the 2 shares of stock standing of record in Louis’s name. We cannot find as a fact from the entire record that the requisites of a completed gift in praesenti existed on May 24, 1947, namely, a deed of gift, or delivery of the property to the donee, intent of the donor to make a gift, and acceptance of the gift by the donee. Brown, The Law of Personal Property, secs. 37, 38 (2d ed., 1955). Furthermore, Paramount was a family owned and controlled corporation, which was closely held. Therefore, the arrangements of May 24, 1947, relating to 46 shares of stock, must be closely scrutinized, Weiss v. Stearn, 265 U. S. 242; Higgins v. Smith, 308 U. S. 473; Commissioner v. Court Holding Co., 324 U. S. 331, and substance must be given greater weight than form. This rule applies, also, to our consideration of the agreement of May 29, 1950. Louis, after transferring the stock into his sons’ names, exercised the same control over Paramount’s business as he had done before. He was not in such financial position in May 1947 as to give away and strip himself of the ownership of the business which he had founded and developed; he was not in poor health in May 1947, and he had no intent or reason to retire from his only, or chief, business interest. It is argued that Louis’s execution of the memorandum on May 29, 1950, in which he declared that he had no interest in the 46 shares of stock, is evidence of a prior gift thereof in 1947, but we are unable to agree. The memorandum was executed at the request of the attorney representing Luria Bros, because the agreement between Louis and Paramount referred to only 2 shares of stock, and since Luria Bros, had loaned $75,000 to Paramount, the attorney representing Luria Bros, required the execution of the memorandum to safeguard his client who wanted full security for its loan. Under all of the circumstances the memorandum constituted a formal release, or quitclaim, by Louis which, upon the entire record, represented a release on May 29, 1950, and it is not regarded by this Court as evidence that Louis had made gifts of the stock in May 1947, or on May 29, 1950. It is held that Louis did not make gifts of the 46 shares of stock in May 1947, and that he was the owner of the stock at the time he entered into the agreement with Paramount on May 29, 1950. The next issue is whethér Monroe and Bernard realized taxable income from Paramount’s payment of $93,782.50 to Louis. It is necessary to consider, first, under this issue, the nature of the transaction between Louis and Paramount. Since the agreement of May 29, 1950, refers to only 2 shares of Paramount stock, and since it has been held under the first issue that immediately prior to the execution of the agreement, Louis owned 48 rather than 2 shares of Paramount stock, it is necessary to take into account all of the facts and circumstances surrounding Paramount’s payment to Louis, giving due weight to the fact that Paramount was a closely held, family owned and controlled corporation, and that all of the interested persons are closely related. It is our conclusion from analysis of the entire record that Louis intended to surrender his entire legal and equitable interest in Paramount, represented by all of the stock which he owned, for a total consideration of $93,782.50, and that this was the understanding of his sons. It is our opinion that Louis’s attorney, Elder, having previously carried out the arrangements for transferring 46 shares of stock into the names of Monroe and Bernard, drafted the agreement of May 29, 1950, to reflect the record ownership of the stock of Paramount, and, therefore, that agreement stated that Louis would transfer to Paramount only the 2 shares of stock of which he then was the record owner. In view of the complete control of the corporation in the hands of Louis, and since he and his two sons were the only persons directly concerned with the transaction, arrangements having been made to give Luria Bros., as security for its loan of $75,000 to Paramount, its note secured by mortgages on all of the corporation’s assets, it was sufficient to draft the agreement of May 29, 1950, so as to refer to only 2 shares of Louis’s stock. The important part of that agreement was the consideration which Louis would receive. The sum agreed upon on May 29, $93,782.50, was very close to the book value of all of the stock of Paramount, $94,290.90 (capital $500, plus earned surplus, $93,790.90), on the basis of which the outstanding stock of 50 shares had a book value of $1,885.81 per share. Unless the total sum paid by Paramount was paid for something besides Louis’s equity in Paramount, it must have been paid for his 48 shares of stock. It cannot be concluded, from the entire record, that Paramount paid $93,782.50 for 2 shares of stock having a book value of only $3,711.62. The evidence does not support the contention that most of the consideration, $90,000, for example, was paid in consideration of Louis’s covenant not to enter into any competing business in Ohio, not to interfere with Paramount’s business, and for giving up the present value of future salary payments, and for the elimination of such friction as Louis’s management of the corporation’s business may have caused. Opposed to such theory are these facts: Louis had suffered a stroke and had been told by his physician that he must rest and avoid pressures, all of which necessitated his complete retirement from, or substantial giving up of, business activities. The record shows that on May 29, 1950, he did not contemplate or intend going into any business, in Ohio or elsewhere, and that he did not do so. We are not impressed by the explanation that Louis’s participation in the management of Paramount caused extreme controversy and conflicts, except to the extent that such irritation as he may have exhibited, at times, could be explained by his physical condition and poor health, which provided good cause for his willingness to end his interest in the corporation. Furthermore, Louis had moved to Florida and his visits to the corporation’s office in Cleveland were infrequent and of short duration each year. Also, there is no evidence whatsoever of any negotiations on or before May 29, or discussions, about the payment of any amount of consideration for the covenants in question; they were not bargained for, nor evaluated. The record indicates that they were inserted in the agreement to give assurances to Luria Bros., which had become a creditor of the corporation, in order to satisfy Luria Bros, about the future success of the business, as well as to satisfy the customary concern of the lawyers who were present that the agreement with Louis was adequate and formally correct. In addition, the record before us contains no evidence that any part of the total consideration paid by Paramount represented the present value of Louis’s future salary payments which he might have received if he had not retired. The minutes of the corporation show that since its organization, the rates of compensation for the services of Louis, as well as of Monroe and Bernard, were fixed at the beginning of each year by duly adopted resolutions of the directors. That is to say, there was no agreement in existence in May 1950, or before, that Louis would be paid any fixed amount of salary and extra compensation continuously or for any period of more than 1 year. It is concluded, therefore, that Paramount paid Louis $93,782.50 for all of his shares of stock, namely, 48 shares; that the miscellaneous covenants of Louis in the agreement were merely incidental to his disposition of his stock in Paramount, George H. Payne, 22 T. C. 526; Aaron Michaels, 12 T. C. 17; and that Louis sold the 48 shares. Having reached the conclusion that the agreement of May 29, 1950, accomplished a sale by Louis of his 48 shares of stock, we now consider whether the transaction resulted in the constructive receipt of dividends by Monroe and Bernard in 1950. The record as a whole establishes that Monroe and Bernard decided on May 28 to purchase all of Louis’s interest in the corporation, but they were without sufficient funds to make the purchase themselves, and, also, the corporation did not have enough cash on hand for such use. They were able, however, to enter into an arrangement with Luria Bros, whereby Paramount gave that concern an option to purchase all of its scrap, provided it suited Luria, and agreed to make all of its scrap available to Luria, first, over a period of years. Such arrangement induced Luria to loan Paramount $75,000 with which the corporation proceeded to purchase all of Louis’s stock. There was no thought of any partial liquidation of Paramount in so doing; no such contention is made. Paramount continued the operation of its business after the transaction with Louis, just as it had done before; in fact, such continued operations were required under the arrangements made by Monroe and Bernard with Luria Bros. It is abundantly clear that the purpose of the transactions on May 29 was to enable Monroe and Bernard to purchase all of Louis’s interest in Paramount. Since Paramount was a family controlled corporation, and came under the complete control of Monroe and Bernard on May 29, it was possible for them to proceed as they did. In effect, they caused Paramount’s cash to be distributed for their benefit, i. e., to purchase all of Louis’s stock. It is clear that no loans were made by Paramount to Monroe and Bernard. The arrangements had the same effect as though the sole stockholders had withdrawn funds from Paramount for their own use and benefit. Such withdrawals would be taxable as dividends to Monroe and Bernard. Ruphane B. Iverson, 29 B. T. A. 863, 870. Since Paramount had accumulated earned surplus in the amount of $93,790.90, it must be concluded that the payment of $93,782.50 by Paramount constituted taxable dividends constructively received by Monroe and Bernard in 1950, in the amount of $46,891.25 each, under section 115 (b), 1939 Code. Cf. Wall v. United States, 164 F. 2d 462. It is well established that the disbursement of corporate earnings serving the ends of a stockholder may constitute a dividend to such stockholder even though there is not the formality of a dividend declaration. Paramount-Richards Theatres v. Commissioner, 153 F. 2d 602, 604; Byers v. Commissioner, 199 F. 2d 273, 275. Monroe and Bernard make an alternative argument that they received nontaxable stock dividends from Paramount which constituted dividends of common on common stock. This theory cannot be regarded as having any merit whatsoever in the light of all of the facts and circumstances. There remains for decision the issue presented in the case of Louis (Docket No. 55934) which is whether $93,782.50 was received solely in exchange for his 48 shares of stock, so that the profit realized is properly taxable as capital gain. The respondent has taken the view in Louis’s case that Louis received consideration for only 2 shares of stock, that he made a gift of 46 shares in 1947, that the 2 shares of stock had a nominal value only, that he received all of the sum of $93,782.50 in consideration for his resignation as vice president, director, and general manager and for his relinquishment of all rights and claims to any further salaries and extra compensation for 1950, and thereafter, and for covenants not to compete and not to interfere with Paramount’s business, and that, therefore, the entire sum is taxable as ordinary income. In determining the deficiency, respondent took a slightly different view, treating $20 as a return of capital and the balance, $93,762.50, as ordinary income. The conclusions set forth above dispose of the issue in Louis’s case. Respondent erred in his determination. It is held that Louis, on May 29, 1950, sold 48 shares of Paramount stock, and that his profit is taxable as capital gain. Because it is agreed that minor adjustments properly were made by the respondent, a Eule 50 recomputation is required in his case. The provisions of section 275 (c), 1939 Code, apply in Docket Nos. 60820 and 60821. The deficiencies are not barred. Decision will be entered under Rule 50 in Dochet No. 55934. Decisions will be entered for the respondent in Docket Nos. 60820 and 60821.